JOURNAL ENTRY AND OPINION
{¶ 1} Defendant, Donald Ennist, appeals his conviction on one count of intimidation in violation of R.C. 2921.04.
 {¶ 2} In June 2004, defendant and the victim, M.M., were living together in her apartment. The victim alleged that on June 22, 2004, defendant raped her in the apartment. She drove to the police department and reported the assault. Detective Anthony Medved drove her to the hospital for a rape kit evaluation. After the hospital, she and Medved returned to her apartment and found defendant still there. Defendant was arrested.
 {¶ 3} In July 2004, defendant was indicted on charges of rape in violation of R.C. 2907.02, kidnapping, R.C. 2905.01, and intimidation. Defendant's case came to trial on January 12, 2005.
 {¶ 4} The jury acquitted defendant on the rape and kidnapping charges, but convicted him on the intimidation charge. Defendant was sentenced to three years of imprisonment and ordered to pay restitution. Defendant has filed this timely appeal, in which he asserts four assignments of error, the first of which states:
I. THE TRIAL COURT ERRED IN NEGLECTING TO ENFORCE DONALD ENNIST'S SPEEDY TRIAL RIGHTS.
 {¶ 5} Defendant argues his right to a speedy trial was violated. Ohio's speedy trial statute is R.C. 2945.71(C)(2), which states:
(C) A person against whom a charge of felony is pending:
* * *
(2) Shall be brought to trial within two hundred seventy days after the person's arrest. Section (E) of the statute explains how the days are computed if a defendant is in jail instead of released on bond:
(E) For purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. Without any tolling exceptions, therefore, defendant would have had to be brought to trial within ninety days after his arrest.
 {¶ 6} The time parameters set forth in the statute can be tolled under certain circumstances. One of those circumstances include: "Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E). Requests for discovery and motions for bills of particulars are tolling events pursuant to R.C. 2945.72(E). State v. Brown, 98 Ohio St.3d 121,2002-Ohio-7040, 781 N.E.2d 159. Section (H) of the statute also provides tolling for "* * * [t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]"
 {¶ 7} In the case at bar, because defendant was arrested on June 22, 2004, the speedy trial calculation began on June 23, 2004. Defendant, therefore, would have had to be brought to trial within 90 days from June 23rd, or no later than September 20, 2004, if no tolling exceptions apply. R.C. 2945.72(E) and (H).
 {¶ 8} On August 10, 2004, defendant filed a motion for a bill of of particulars. The state responded to that motion on August 18, 2004. Since eight days elapsed between defendant's motion and the state's response, those eight days extend the September 20th deadline to September 28, 2004.
 {¶ 9} However, on August 27, 2004, defendant filed a motion to suppress, which automatically tolled the speedy trial time.State v. Beam (1991), 77 Ohio App.3d 200, 207, 601 N.E.2d 547. The trial court denied this motion on November 4, 2004. Sixty-nine days passed between the date defendant filed his motion and the date the trial court denied it. Because sixty-nine days are added to the speedy trial date of September 28th, the new trial date deadline is moved to December 6, 2004.
 {¶ 10} On December 1, 2004, defendant requested and received a trial continuance until December 15th. On December 15, 2004, the trial was continued on the court's own motion because the sitting judge had recently been appointed to the federal court. The trial judge was, therefore, unavailable. The trial date was continued to January 12, 2005, on which date the trial began. Defendant remained in police custody until the date of his trial on January 12, 2005.
 {¶ 11} From this record, we find no violation of defendant's right to a speedy trial. When we take into account the tolling periods caused by defendant's own motions and the one understandable trial continuance initiated by the court, we find no error in defendant's trial beginning on January 12, 2005, which was within within the statutory 90-day period.[1]
Defendant's first assignment of error is overruled.
II. THE TRIAL COURT ERRED IN IMPOSING RESTITUTION FOR A CONVICTION WHEN IN FACT HE WAS ACQUITTED OF THE CHARGE.
Defendant argues that since he was acquitted of the rape charge, he should not have been ordered to pay restitution for Montgomery's rape kit examination.
 {¶ 12} Because the state concedes this error, we need not make any further comment. Defendant's second assignment of error is sustained.
III. DONALD ENNIST WAS NOT GUILTY OF INTIMIDATION, [SIC] IN THE WORST CASE SCENARIO HE WAS GUILTY OF MENACING BY STALKING.
IV. THE EVIDENCE ADDUCED AT TRIAL WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A FINDING OF GUILTY.
 {¶ 13} In assignments of error three and four, defendant argues that the evidence was insufficient to support his conviction for intimidation. At best, defendant claims, he should have been convicted only of the offense of menacing by stalking. We disagree. The crime of intimidation is defined in R.C.2921.04(B), which states that the offense is committed when one "knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in crime in the filing or prosecution of criminal charges * * *." R.C. 2921.04(B).
 {¶ 14} Unlike menacing by stalking, the offense of intimidation requires proof of a knowing attempt "to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges."
 {¶ 15} When reviewing sufficiency of the evidence, an appellate court must determine "`whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Rosado,
Cuyahoga App. No. 83694, 2005-Ohio-6626, at ¶ 23, citing Statev. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, syllabus.
 {¶ 16} We find the evidence in the case at bar was sufficient to support defendant's conviction for intimidation. The victim testified that after defendant was arrested at her apartment, her next contact with him occurred when he called her from jail.
 {¶ 17} She described that conversation as follows:
Q: * * * If June 22nd of 2004 is a Tuesday, when do you next hear from the defendant through any device or means, whatsoever?
A: He called me from jail. I couldn't believe it. He called me from the jail telling me to come and I better come down here and drop these charges and get him out of jail. And I couldn't believe it.
Tr. 314.
 {¶ 18} The victim also identified the several letters defendant wrote to her from jail:
Q: Did you ever then receive any mail from the defendant?
A: Yes.
* * *
Q: Could you describe the circumstances under which that happened?
A: He was just sending me all these letters he addressed to me. He had a no contact rule on him where he wasn't supposed to be contacting me.
* * *
Q: Let me just ask you a series of questions. When you received these letters from the defendant, how would they get to you?
A: In the mailbox, U.S. mail.
* * *
Q: And on the reverse of State's Exhibit 4(A), the underlined portion of it, what does it say?
MR. MANCINO: Objection.
THE COURT: Overruled.
A: Drop the charge.
Q: And it goes on to indicate — why don't you read that last paragraph for us?
A: Right here?
Q: Where it says (indicating).
A: "Drop the Charge. They can't stop you from dropping the charges. It's best for the both of us."
Q: Now, when you read that sentence, "it's best for the both of us," how did that make you feel?
MR. MANCINO: Objection.
THE COURT: Overruled.
A: I thought he was crazy. I just wished he would leave me alone.
Q: Okay State's Exhibit 4(B). If you will, what do you find that to be?
A: Another letter from Donald.
Q: And are you familiar with the overall tone of that particular letter?
Q: Do you understand what I mean?
A: No.
Q: Not your fault. I'm not asking a good question, I suppose. When you recall reading that letter, what were your thoughts and feelings?
MR. MANCINO: Objection.
THE COURT: Overruled.
A: When I read this letter, I said that he was trying to get me to drop the charges, and this is trying to make me feel sorry for him or something. I don't know. But I just want him to leave me alone.
Q: And he has a little drawing here where he signed his name. What's that?
A: Two heart halves broken.
* * *
Q: If you could, State's Exhibit No. 6, could you again identify that for us, please?
A: Another letter from Donald addressed to me, June 29th.
Q: Now, upon opening this particular letter, if I may, there seems to be many or numerous letters; is that correct?
A: Yes.
Q: This is how you recall receiving this particular letter?
A: Yes.
Q: Starting with 6(A) and 6(B), for purposes of the record, this appears to be a two-page letter back and front each side?
A: Right.
Q: Do you recall who highlighted this particular letter because there seems to be highlighting on it?
A: I did.
Q: Why did you?
A: These parts are the parts that terrify me, not knowing what they mean.
Q: Could you read those for us, please?
A: "Michelle, hold on to my things. Even if you don't, I will still be seeing you. People that protect you can't be there 24 hours a day. I'm not threatening you. But we will talk. No matter how long I'm in for, it's better we talk. I [sic] trying to save both of us. Staying at home will not do no good. I will talk to you."
Q: There is highlighting on the back of that, too?
A: "I always said you are a wonderful woman. I just needed to stop hitting. We would be together today. I miss and love you very much, Michelle. It's all my fault."
Q: And there is highlighting on 6(B), as well, on the very back correct?
A: Yes.
Q: What does that say?
A: "When I get out I hope to hold you the first or last time in our lifetime."
Q: When you read these portions of that letter, how did that make you feel?
A: Scared because I know what he means by that.
Q: Why do you know what he means by that?
MR. MANCINO: Objection.
THE COURT: Overruled.
A: Because he used to tell me that all the time, he was going to kill me.
MR. MANCINO: Objection.
THE COURT: Overruled.
Q: Now, trying to go through this thoroughly, but efficiently, State's Exhibit 6(D) has highlighting on that portion. Can you read that for us, please.
A: "I will see you, Michelle. I will have a lot to talk about. You just don't know how much anger is in me right now. I really don't want to do something I will be sorry for, Michelle. Death do us part."
Q: Now, the particular word, death, there appears to be some highlighting of that?
A: He underlined it three times.
Q: What was underlined three times in that letter?
A: Death.
* * *
Q: But moving to 6(F), if you would again, this is page four of a letter that he wrote to you in that envelope that I previously had shown to you. And there is some highlighting on the front and back. Can you read the front, if you will, the highlighting?
A: "I know things look bad right now. When I get out, it will look worse. I'm sorry, but I have to do what I must do to make sure you will not be outside living."
Q: When you read that — did you read that letter?
A: Yes.
Q: When you read it, how did that make you feel?
A: Scared and afraid.
* * *
Q: Using 6(G), with the 5 circled at the top, could you read the highlighted portion?
A: "See you soon. I love you. But you owe me. You know nothing intended. But the longer I'm in here the madder I get. After three or four years, I should be ripe."
* * *
Q: And on page — what is now marked 8(C) for the record, in the middle portion of this letter, is there an indication of what you should do in regard to appearance for court, where my finger is pointed?
A: "Hope, please, God I hope to see, visit or yell out the window. But please talk to me soon. Don't show up for court. I don't want our personal life to be put all out, yours or mine. * * *
* * *
Q: 9(C) on the first page has some highlighting at the very bottom?
A: Yes.
Q: Who highlighted that?
A: I did, yes.
Q: Why did you highlight that portion?
A: Because I wanted whoever read this to see the threatening things he wrote in the letter.
Q: If you could read that for us, please.
A: "If I wanted to hurt you, I would wait until I get out. No one will be with you 24 hours a day. All it would take is a split second, Michelle."
Tr. 314, 319-320, 322-327, 331-332.
 {¶ 19} From this record, after viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime of intimidation committed by defendant. The victim's testimony and the various letters defendant sent her establish beyond a reasonable doubt that he knowingly, with unlawful threat of harm, attempted to influence, intimidate, or hinder her into either dropping the charges against him or refusing to testify against him. Defendant's third and fourth assignments of error are overruled.
 {¶ 20} Because we have sustained defendant's second assignment of error, we modify the sentence to vacate the restitution order. In all other respects, the judgment of the trial court is affirmed.
Judgment accordingly.
It is ordered that appellant and appellee split the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for modification and execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, P.J., and Gallagher, J., concur.
[1] Defendant had other pretrial motions for continuances and executed a limited speedy trial waiver, which, all together, also demonstrate that defendant implicitly consented to not being brought to trial by September 20, 2004, the original speedy trial deadline.